Cruz-Escoto in this case. I would first like to address the trial court's error in prohibiting Mr. Cruz-Escoto from presenting the evidence from his defense investigator, which would have impeached the primary government witness at trial. It's been our contention throughout that the trial court's limitation on the presentation of this evidence violated Mr. Cruz-Escoto's Sixth and Fifth Amendment rights and goes to the core of his constitutional rights at trial. The investigator was called specifically to impeach the case agent on whether or not he was looking directly at the line, at the international boundary line, around the time that Mr. Cruz-Escoto crossed into the United States. What was the reason for excluding the witness? What reason did the court give? Relevance, and then she also made some comment about being an expert witness that wasn't disclosed. However, because it was impeachment evidence, as the case is cited in my reply brief, demonstrate ---- So it didn't have to do with his qualification? No. Well, wasn't this investigator just testifying to things that any light person could observe as to whether your car was pointed this way or that way and what you could see? No. Our position is, is that he would have testified as an expert on surveillance, that when you're doing long 8-hour shifts, it's very important the way you position yourself because of fatigue and muscle problems and the ability to remain focused while on duty for that long. Most jurors, and myself included, have never done an 8-hour shift of surveillance. Those sorts of factors do not pop into my mind when I think about whether or not this person is lying when he says, you know, I was looking in this direction or that direction. The prosecution in their responding brief repeatedly notes that Mr. Cruz-Escoto could attack the credibility of the agent and that the Pacheco defense, the official restraint doctrine defense, was still viable because of the credibility of the agent being open to dispute, and yet the trial court ---- Did you make an offer of proof in connection with your ---- Brief summary of what that was. The summary is that he would have testified that you always want to make sure that you position your vehicle in the direction that you're looking, that if you position your vehicle in one direction and then you proceed to look in another direction, you're ---- it's going to be impossible to continue that for an 8-hour shift. You're going to have muscle problems. You're going to have fatigue problems. So that it's a primary basic rule of investigation that you want to have yourself situated in your seat in the direction that you're going to be looking. Now, the agent initially ---- The purpose of that was what? To impeach the agent's testimony? Correct. Well, you could do that, but cross-examination, I suppose, too. And it was done, wasn't it? Well, I did cross-examine him, but there's no limit in the Constitution on how much evidence you get to present in order to make your case. And, in fact, there are several Ninth Circuit cases cited in my opening brief that say that the defendant has a right to present not just the primary evidence but corroborating evidence. To say that I could cross-examine the case agent is simply not sufficient when Mr. Cruz-Escoto has a Sixth Amendment right to present evidence on his behalf. And the case ---- I think that would be kind of like just ordinary common sense that people would have on a jury, like in order to stay alert watching the border, you need to drink coffee in the middle of the night or something like that. You can't be looking this way while you're facing this way. I mean, it's just common sense, isn't it? It makes sense to you when you hear it, but the question is, is it going to occur to them in the first place? And that's what I experienced in this case, was that as trial counsel, it didn't occur to me initially until my investigator brought it up to me that this is implausible, that you would position your car facing one direction and then you would be surveilling in another direction, and he has a right to present that evidence. That's really the bottom line. He has a right to present this evidence. He has a right to put on the best case that he can. And the case agent waffled back and forth. Initially, he admitted he was pointing south. Then he said he was pointing west. Then he said I was looking in this direction. And I had a right, and Mr. Cruz-Escoto had the right, to put on additional evidence that would firm up his attack on the credibility of the agent and allow him to make the official restraint defense at trial. But the Court, despite the proffer, refused to allow the evidence. The trial court was even wrong when it reiterated its denial after the proffer in its recollection of what questions were asked, because I – Mr. Cruz-Escoto actually posed two different questions, attempting to get the evidence in one way and when he was foreclosed by the sustained objection, then trying to come in the other way and again foreclosed. So I think that the fact that the trial court was even wrong at the time that it reaffirmed its denial after the proffer shows that for some reason the trial court did not want the evidence in and, quite frankly, was just not very thoughtful about the relevance of the evidence and how – how it could be used by Mr. Cruz-Escoto. The government also contends that Mr. Cruz-Escoto did and can make the argument in closing argument, but there's an instruction that goes to the jury that says argument's not evidence.  Kennedy. I have a question about Mr. Cruz-Escoto. Did you ask him whether your investigator had any expertise in surveilling? Well, he had 20 years in the military police as an investigator. Could you put him on the stand and ask him that? Yes. And I also asked him about his expertise in surveillance, and he specifically mentioned how many surveillance case – times he'd been out, you know, hundreds of times. So the foundation for admission of his testimony as an expert witness was there. If the – if that was – So he wasn't barred for lack of qualification? No. There was no allegation that he was unqualified. There was no request to take him on voir dire. The objection was relevance. The objection to – I mean, the response of the trial court to the relevance objection was – It was more along the – what Judge Seiler may have been suggesting, that, well, you know, maybe the judge – trial judge felt it wouldn't be helpful to the jury because it's a matter of common experience, right? Well, the trial court didn't say that. And I – What did she say? If you'll give me a minute, I can get the brief to tell you. Well, no. I don't want you to take too much time. Just if you recall, it's fine, but if not. Well, I – I believe she just said – she characterized one of the questions and said that it was improper and she wasn't going to allow it. But she omitted the reference to the other question because I was asking him both how would you normally position your vehicle when doing a long shift of surveillance and then when I was shut down on that, I said, you know, you heard the testimony of the agent. Was there anything that struck you as unusual or problematic about that testimony, trying to get at that same evidence that it's unreasonable and unworkable as a surveillance agent to point your vehicle in one direction and be looking in the other? This was during the voir dire. This was just during the examination. It wasn't characterized as a voir dire at that particular time, and actually it was after I had moved off of his qualifications and into the actual questions relevant to my inquiry, which was as to the surveillance of Agent Vo, who was the case agent and the primary agent in this case, since the only issue at trial was the official restraint issue, the Pacheco issue. Well, the prosecution says that you really didn't tender this person as an expert, just as a layperson, right? Well, if I didn't say the magic words, then that's an omission. But I would point the Court to the record, which is that I did examine him initially on his qualifications. They said you didn't give notice. Was that an issue? Notice was not required because he was offered as an impeachment witness. Notice isn't required for rebuttal evidence, even if it's an expert. It's routine in drug cases that we have the DEA agent take the stand and rebuttal and testify as an expert witness on surveillance and counter-surveillance about what drug dealers do and do not do, and that is never excluded because of lack of notice because it's rebuttal and impeachment evidence. Those cases are cited in the reply brief. And in this particular case, it was offered, the evidence was offered to impeach the testimony of HMVO, and so there was no requirement for any. Well, let's be clear about what the judge did. Question. When you do surveillance, this is to Mr. Castillo, how do you want to position your car when you're watching an area? Mr. Stone, objection, relevance, court, sustained speculation. All right. Question by you. You heard the testimony of Agent Viao regarding how his Border Patrol vehicle was positioned and where he was looking. Was there anything about that that struck you as odd or unusual? Same objection, Your Honor. The court, 403, sustained. Ms. Hall, Your Honor, could I make a proffer? Not at this time. So the first finding was speculation, which would indicate to me that there was no foundation upon which this witness could testify. And secondly, the court did state that 403, which is an undue consumption of time, though relevant, the prejudicial effect outweighs the probative value, right? There was never a ---- So the question for us then is, as to the actual basis upon which the trial court ruled, was there an abuse of discretion? I believe so, Your Honor. I have a hard time understanding the speculation objection. My question was, how do you position your vehicle? That was not an objection. It was a ruling. The ruling, correct. How do you position your vehicle when you want to observe a particular area? I don't understand how that invoice involves speculation. I wasn't asking him, you know, if you were surveying this area, you know, what would you do, although I don't think that would be speculative either, quite frankly. I don't think that the question called for any form of speculation. It was asking for the proper procedures to be employed when surveilling a particular area. Maybe if you phrase it that way, what is the custom and practice among well-practiced surveillance persons in a self-centered I would admit that that's a better formed question, Your Honor, but there's nothing about the question that was posed below that calls for speculation. If you only have seven and a half minutes left, If you want to move on to what you characterize as your the primary issue, namely the application of the official restraint rule or doctrine, what I'm not sure about and what I think is important to me in resolving that issue is exactly what the physical layout of this channel was. Can you describe that to me? It's a it's a little bit of a bizarre layout if I can. And I'll use my hands. The fence is running along. Let's say that the fence is running along right here with the edge of the podium. And then there's a gap where there is a drainage ditch and the ditch. When you say the fence is running along right here, that's the east west fence along the border. Yes. Go ahead. Yes. And then the the channel, which is a dry riverbed or a drainage ditch, it's a little bit bigger than a ditch, runs across the border at an angle and sort of curves around to as it crosses the border. There's no fence where there is no fence. It is a big gap in the fence. The fence comes from the west, comes from the east. And then there's an opening and that's the opening through which this riverbed runs. Exactly. Exactly. And there are actually two fences because there's the east west fence. And then there are fences along the actual border of the channel that run somewhat north south. But since the channel itself curves around, their direction curves as well. Are there any fences along the channel? No. No. It's a wide open space. So just when you say it, I gather it's lined with concrete, right? Correct. So like a person going along the riverbed could just clamber up the side. They could just walk down the riverbed. At the time that Mr. Cruz Escoto was caught, it was dry. And you can walk up the side of the bank and out into wherever it is, desert. Is that right? Correct. Correct. Exactly. It's not an enclosed area. Exactly. And along that channel, several hundred yards down from the border, up from the border, is this observation post. Is that right? That's correct. There are the fences that are along the banks of the channel. And there are fences that run along the border. Wait a minute. You just told me the channel was not fenced. The banks. There are fences along the banks. The banks, but the actual channel is still unfenced. Okay, so you- There's a channel and then there's a bank going up? Yes. And there's a fence along the side? Yes. So a person going along the bank couldn't get out of the channel without climbing over the fence? They'd have to go further. Yes, they'd have to pass where that fence along the banks ends. Well, how far is that? Is that passed where this observation post is? Yes, I believe so. I believe so. In other words, if somebody gets in the channel on the Mexico side, you can't get out of the channel until after you pass that observation post? Is that what you're saying? Yes. And that's why I call it a type of net. Well, wait a minute. So the fences come down the sides of the channel, and then do they join the border fence right at the corner there? They actually, I believe that they actually connect perpendicularly at those points. No, we're just not hoping for someone to walk through there. Right. And you can just walk through the channel, you know, unimpeded, but you can't – you have to pass that Border Patrol permanent post officer who's right there. Now, there are some exhibits in the – Before you can leave the channel. Before you can leave the channel. Go ahead. I think I get the picture now. Right. And that's exactly what the evidence showed here was that Mr. Cruz-Escota was running from Mexico through the channel. There is a yellow line through the dry concrete sort of ditch which marks the international boundary line, and he had already crossed that line when the agent claims he first saw him. That gets to the other issue of whether or not that was indeed the first time he saw him. But the agent's testimony is the first time he saw him he was 100 yards in. He was running alongside the fence. As Your Honor pointed out, he had not yet passed beyond that fence area and come to an area that was free from these obstructions. And the officer was on the other side of the riverbed and drove across the dry riverbed and apprehended Mr. Cruz-Escota. He did exactly what he was supposed to do. He served as the primary line of defense, which he admitted that's what he was there for. He was there to make sure that people didn't cross through the border. There is a post there 24 hours a day, seven days a week. It is a permanent Border Patrol post at that particular area because it's a gap in the fence. And it's our contention that because it's a permanent post, it's always staffed by a Border Patrol official who is armed in a marked vehicle and there to apprehend people at that particular point. It is different from the surveillance cases or the cases where people are climbing over fences in remote areas where they are simply caught by a surveillance camera. And it's our position that it would be an inconsistent or an odd result for surveillance where no one is around to constitute official restraint, where in this case you have an actual armed Border Patrol officer in his vehicle and he's there stopping this guy who is literally running into his arms, and yet that is not. What if the illegal alien keeps an eye on the man in the car and when he sees him dip down to have a sip of coffee, then he goes across? And then the first time that he's observed by the surveillance officer, he's in the United States? Well, it's our position that it's. Are you saying that we've had to find as a matter of law that a manned surveillance post means that any entrant is under restraint? My position is that if he hasn't passed that point where the post is, he hasn't entered free of official restraint, that that post position, which is interior into the United States just as the port of entry is, that that post position forms a kind of line there. And until he is broken through that line, he has not broken through free from official restraint. It's like an invisible fence, if you would, like an electric fence, if you will, you know, that's there. Until he scales that particular imaginary fence, he has not broken free from the restraint, which is the official presence of the armed, uniformed Border Patrol official right there at that particular post. And you're assuming as a matter of law that their eyes are open and they're watching all the time? Well, their position there, in our view, their post and their position there forms that sort of restraint. And they may, you know, dip down to get their coffee, but if the person has not passed by that post, then the person — If you move the post back another 400 yards, then you essentially move the border 400 yards farther, right? Well, I think it would depend on the facts of the case. I think every case is fact-specific, but here we have a very limited area and we have a permanent post there just a few yards into the United States right where the fences are. And so I think under the peculiar facts of our case that that permanent post does form the border there. And I understand I'm over my time. Thank you very much. Good morning, Your Honors. May it please the Court, Mark Grady for the United States and also present at counsel's table is the trial prosecutor in this case, Stephen Stone. Your Honors, I think I'd like to address the issues in the reverse order so that way I get right away to this official restraint issue. And first off, I want to say the government takes issue with some of the factual descriptions of the record proffered by defense counsel. When Judge Tashima asked about what this area looked like, this Court can see for itself excerpts of record, pages 141 through 148, are color overhead pictures of this area. And I know defense counsel wants to give this impression that once somebody gets into the channel that there's no way out, but I would direct this Court to excerpt of record 146, which indicates that ---- Just a minute. 146. Correct. Go ahead. In that case, if one looks to the bottom part of that picture, you see a jeep there, and that is a Border Patrol jeep. Now, the evidence in this case is that the jeep was actually pointed not where that fence, which is the concrete-pillared fence, and actually that ---- The jeep in 146 is facing southeast. Exactly, Your Honor. It's unfortunate. This is a jeep. This is the way the defense expert would have testified he should have been pointing, right? Exactly, Your Honor. This is how they wanted it to be. But Agent Val testified unequivocally. He was asked on direct and he was pressed on cross-examination that he, that night, was pointed southwest. So, in other words, south is to the left of this picture, right? Well, south is basically, I think, at the very bottom edge of this picture. Oh, I'm sorry. That's north, correct. United States is at the bottom. North is what? Is at the bottom of that picture. Those cars that you see in that parking lot, that's on United States soil. Well, wait a minute. Isn't in the middle of the picture running horizontally across the picture the river channel? Correct. Are you telling me the river channel runs east and west? At this point, yes. Just a little off to the left. It's basically a channel that comes north up for Tijuana. Once it hits the border, it immediately veers left and goes west to the Pacific Ocean. All right. Now I'm following you, Your Honor. All right. Now, along that way, as you can see at the top of that government exhibit three, there are two fences. And those are the two fences that the agent testified to. The first one is closest to Mexico. It's comprised of steel. That's the primary fence. And then about 15, 20 yards north of that, there are those concrete pillars. That's the Ballard fence. But the reason I bring up this picture, Your Honor, is because I got the impression when you asked the question, you're wondering if, when an alien gets in this channel, is there no way out? Is he basically right in front of the border patrol? I would say if you look where that Jeep is on government's exhibit three, there is an area, I don't know, it appears to be at least 40 or 50 yards wide. If a defendant were, if an alien were to get through, keep in mind, this happened at 2.30 at night, this case. This wasn't in broad daylight. But isn't it lit? I see all these lights on these standards here. True. It's lit as well. Ball stadium lights. But this goes to the point as to whether Your Honor is saying once somebody is in that channel, is there nowhere to go? And the whole point is if a defendant is exercising his free will and his agility, maybe the agent at that point, at that time, you know, he gets out of his car. He walks a little further to his right. Pardon me, Mr. Ray. Where can the alien, I'm sorry, tell me where the alien can, you know, escape from the channel here on this picture? Between. Sort of to the rear of the Jeep? Exactly. Where that Jeep is, if you look a few inches to the left, then starts another fence. But there is some sort of an access road there. And if an alien can get around that fence and curve to the lower left-hand portion of that picture, he's free to run into the United States. Where is the border? The border is not indicated on Excerpt of Record 146. It's directly to the left. It's quite a ways to the right? No, it's to the left of Excerpt of Record 146. All right. Correct. In that picture, you can see where the border is on Excerpt of Record 144. Now, are you telling me that everything I see in 146 is the United States of America up to that black fence where the cars are running on the Mexican side? I believe, yes. Yes, that is correct, Your Honor. That is the United States. That is the channel. When an alien is in that area there, he's already in the United States when he's in the channel. Correct. How far is the opening in the fence over to the left in Governing City? That opening, I mean, basically, if you look at Excerpt of Record 142, the opening goes the width of the channel. The opening goes what? I'm sorry. If you even look at Excerpt of Record 144. 144 or 2? Let's look at 144. Okay. Because I think it's shown clearer there. Near the left-hand margin of that page, you can see a yellow line, and it extends where a fence stops. That is the international border. Where is this on this? It's basically in the middle left of the picture, Your Honor, at the top of where the water runs. There is a line. Line going which way? It's basically going east and west. It's running down that bank towards the water. Well, you see the little loop? Yeah, to the left of the loop a couple inches. Left of the loop. Yes. All right. And there appears to be something that's catching the glint of the sun. So a person can walk through that hole there, and he's in the United States. Correct. Where that river is. Here, where is the border in 144? 144, it's right near the left margin a couple inches to the left of the loop that Your Honor referenced a minute ago. Okay. Now, that's the border, so to the left of that line is Mexico? Right. The left and above it. And to the right is, to the right and down is the U.S.? Correct. Okay. I got you. And if you put the two pictures together that we've looked at, basically the one that I showed, the Border Patrol Jeep earlier, continues where the right margin of this picture leaves off. Okay. But Your Honor, really to get right down to it, there's a couple issues at play here. If we look at the precedent of this Court, there seems to be a consistent limit. Just a minute. Just for more orientation, let me ask you to look at the government's exhibit. It must be one. 142. Okay. Right? In 142, where is the border? I cannot see the yellow line in this picture, but I know where it is based on my reference of the other pictures. In relation to where the bend is, where is it? It's basically right there, Your Honor. Right at the bend of the river? Right at the bend, yes. Okay. So is Mexico in the upper right-hand corner? The upper right-hand and the upper left-hand, anything above that line as we look at it in the picture. All right. So above that line on both sides of the river is Mexico. Is that right? I believe that's correct, Your Honor, because that yellow line would continue through. Right. And then below that line is the U.S.? Correct. Okay. I think I generally followed you on that. And this, there's a little jeep by the river, I guess, or some vehicle. That's the same location as 146, right? I think that's exactly correct, Your Honor. Thank you. Thank you. Go ahead. All right. So with this understanding of factual record and issue, let's look at the law. There seems to be a pretty clear statement from this Court that if a defendant is not actually seen crossing the border, he's not under official restraint. And I take that from the Castellanos-Garcia case, 270F, third at page 775, where this Court held that an alien is not free from official restraint, where he, quote, is under constant observation or surveillance from the moment of his entry to the time of his capture. And I would also direct this Court to the Vela-Robles case, page, or 397F, third at page 789, where this Court characterized the same Castellanos-Garcia case that I just quoted for the following parenthetical principle, quote, holding that the evidence did not support an official restraint theory where no agent saw the defendant cross the border and the defendant was found 100 yards north of the border. But those cases don't involve the, you know, the official station cases, right? I'll call them. They didn't have an actual jeep there, no. But I would point out that Vela-Robles had a box canyon where the defendant made a similar argument. I gather that's where the defense is going with this. But first of all, that's sort of a constructive official restraint doctrine. I don't believe this Court has ever held as much. But even if you assume that such a theory is valid, in Vela-Robles, the defendant said, I entered in a more geographical area where it was all hills, and there was only one way in, and that was from Mexico, and there was only one way out, box canyon. And this Court still found that he had entered free from official restraint because he wasn't seen actually crossing the border. And there's another case, United States, this one's almost over 20 years old, Martín Placencia. We cite this in our brief. This is 532F2nd at 1317. The defendant in that case, he was at the San Ysidro port of entry. He crawled under two fences. He only got 50 yards in. And he never made it into the streets of San Ysidro. And this Court specifically said that that wasn't the point. Again, this is direct quote. It's a short one at page 1317. Whether or not he was ultimately able to run the obstacle course and reach the streets of San Ysidro is beside the point. So I say, Your Honors, when we look at this case law and bring all these cases together, if you're not, if the alien is not seen actually crossing the border, he's free from official restraint. Kennedy. Which puts the issue, what did Villal see? And as to that, defense called Castillo and qualified him or did some qualification to which the government didn't object as to his experience as a surveillance person. Correct. Now, what was wrong with putting to Castillo the inquiry that was done by the defendant? In other words, you're an experienced investigator. How would you face in order to see this? I think there were two problems with the testimony, Your Honor. And these were the points that we really made in our brief. And I didn't get the feeling that the defense really responded to them. They're worried about expert notice. Rule 16, we're not arguing that. The first reason why it wasn't admissible is because it wasn't relevant. When given the chance to make a proffer, the proffer of this testimony depended on very specific facts. Where is the proffer in the record? I believe that the proffer is in Supplemental Excerpt of Record 265. 200 what? 200, excuse me, Your Honor. I believe it's the 265, yes. 255? It's 265. The district court didn't allow the proffer at the time but took it at the next break. And it's right in the middle of the page. It's one sentence. He would testify that when you're doing surveillance, it's very difficult to have your vehicle pointed in one direction and then to constantly be looking in another, which was essentially a testimony of the agent. In other words, the vehicle, Bial said his vehicle was pointed south. He was looking west. So he was constantly at a 90-degree angle from the way his car was pointed. What's wrong with this testimony? Because we don't believe that's an accurate description of the testimony, Your Honor. First of all, Agent Bial said he was pointed southwest towards the Ballard fence, and that's in Supplemental Excerpt of Record page. Well, that's a matter of credibility for the jury, right? Well, I don't know. I mean, I look at a case. I use the example, assume a murder case where there's absolutely no claim of self-defense and no evidence of self-defense. Would it be error to exclude an expert testimony who then wants to opine about self-defense? I don't think so. And, in fact, we cited cases of that. So you say the only testimony was Bial said I was pointed southwest. So testimony that he should have been pointed west was irrelevant? Yes. And I don't know that he's saying he was west. According to this proffer, he allegedly claimed that he was constantly looking in an opposite direction. That's not true either. And if one looks at these pictorial evidence that we showed in Excerpts of Records 141 to 146. Well, but the jury's always instructed that if they don't believe some foundational testimony, they'll disregard the opinion based on our own. So why couldn't the jury handle that? Okay. Then that leads me into the second reason why this evidence was properly excluded, which is that there was nothing about this that an average juror couldn't have figured out for himself. And this is not a subject of expertise. Exactly. And we're not disputing. You know, this the word expert, I never even see it in the record. Well, isn't there some difference between a surveillance person who's there eight hours a day and just somebody who's sitting there casually like the jury may be? I don't believe in this case there was any evidence given that there would be so especially different, Your Honor. When one looks to the evidence, this channel's 40 to 50 yards across. Agent Val testified that he's responsible for a three-quarter wide, three-quarters of a mile wide area. So he's basically looking. It's not like he's looking directly to his left or his right. He's on one side of the channel. He's looking over, scanning. This is all that that takes. And the reason we've argued that even if it's not evidence, the fact that defense counsel is able to argue in closing that, look, ladies and gentlemen, it's uncomfortable to be pointed one way and looking another way, that shows how much it's within the common, the common kin of the average juror. So you think that your position is that the judge, using his gatekeeper powers under Daubert, properly ruled that the subject matter of the testimony was not outside the usual kin of the juror? Well, I'll tell you, Your Honor, she didn't use the, say it so in as many words. That would have been nice. I'm not going to say the record is what it isn't, but of course, as this Court knows, it can affirm on any basis having support in the record, even if it's a rationale not relied on by the district court. But I think when one looks to the – I know earlier you pointed out the issue. Well, she said it was 403, which sounds to me like is undue consumption of time relevant but prejudicial. That's correct. And I have a feeling the prejudice can be inferred from the United States v. Gaston case. It's black-letter law that one witness cannot be asked to opine on the credibility of another witness. And I have a feeling there's a good chance that that's what she's referring to, because that particular question was, well, you heard Agent Val's testimony. He testified to such and such. Was there anything about that? It's not a bit of speculation. It is, Your Honor. But again, I feel it's at least – I mean, it's not – it's a rational inference. If I'm here to defend the district court's ruling, and I can see case law that says you can't have one witness opine about the credibility of another, and then here this witness has asked, well, you heard what Agent Val testified. Don't you think that's odd or unusual? I think we can infer that that would come under a Gaston type of analysis. I like your point better for your side that we can affirm on any ground. That's very well, Your Honor. I think with that, then, I will probably submit unless this Court has any further questions. Nope. No more questions. All right. I think I've used most of my rebuttal. But if I could just – I just wanted to point out another issue with regard to Castillo is that initially my question to him was regarding where the vehicle is pointing the times that he had been to the border. He testified he'd been to the channel area of the border three times. And on each occasion, he saw the Border Patrol vehicle facing south. I believe that Agent Vo's testimony moved around a little bit as to exactly where he was positioned. And so our defense was to elicit the evidence from Castillo that the vehicle is always pointed south. Every time I've been there, it's pointed south. It's pointed south, so it'll point directly at the gap. And then to move on to you face your vehicle in the direction that you are going to watch when you're going to do an eight-hour shift of surveillance. I do not believe that there's any undue prejudice in this, and it goes directly to his defense. Given the instruction of the Court on Pacheco, he was limited to attacking the credibility of the agent who was on duty there to argue that the agent had actually seen him. And this was really his only chance to do it. It wasn't going to take very long. The trial only took a day. And he has that Sixth Amendment right to present some evidence in his defense. And that, we argue, was violated. He doesn't have an absolute right to present evidence in his behalf, right? It's subject to relevance and materiality and things like that in every case, right? Correct. But in this case the only defense at issue here was the official restraint doctrine. And the judge instructed that Mr. Cruz-Escoto had to be seen crossing the border in order to present his official restraint doctrine. Now, we dispute that, but that was the instruction. It was critical that he be able to argue that despite the testimony of the agent, he really did see, must have seen him cross the border since that's where the vehicles are positioned, and that's where you're going to be looking when you're an agent on duty at the gap in the fence. But he was precluded from presenting that evidence, and he was left with non-evidentiary closing arguments by counsel. And that was just not sufficient. Do you agree that Viao testified that he placed his car looking southwest? I believe that the record shows that he changed his testimony somewhat. That at one point it was either south or southwest, and then at another point it was west. But, yes, he did not, Viao did not agree with me that he pointed his vehicle directly south, but that was another area in which I sought to impeach him with the testimony of the defense investigator. And did Cruz-Escoto testify? No, he did not. What was the other evidence as to where he came from? Was there anybody else? That's it. The only witness to testify where and how he crossed was Agent Viao. That's it. There's no evidence that he came through the gap at all. Well, it was our position and our argument that because of where the agent was at that point, that he had to have seen him cross the border. Because he had to have seen him come through the gap. Correct. But nobody saw him come through the gap. That was Agent Viao's testimony, which we disputed, but we weren't able to fully dispute that testimony because we couldn't present the testimony of Castillo. And you couldn't present the testimony of Cruz, of your client. Well, he exercised his Fifth Amendment right. That was his choice. All right. Thanks. That was his choice. And I believe the case law gives him the right to still, even though he exercises that Fifth Amendment, to call evidence. But that doesn't provide evidence of where he came from. The defense investigator, right. But he could certainly undermine the credibility of the only witness of the government counsel. Thank you. Thank you. Thank you.
judges: Siler , Tashima, Bea